Filed 3/9/16  P. v. Ramirez CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B261613 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No.  GA090571) |
| v. | |
| FERNANDO SABINO RAMIREZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dorothy L. Shubin, Judge.  Affirmed.

Sally Patrone Brajevich, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Michael R. Johnsen and Gary A. Lieberman, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Fernando Sabino Ramirez was convicted of involuntary manslaughter and assault by means likely to produce great bodily injury. He challenges his convictions, arguing that they fail for want of sufficient evidence. In addition, he contends that the trial court committed evidentiary and instructional error, and that there was prosecutorial and juror misconduct. We reject his contentions and affirm.

## RELEVANT PROCEDURAL HISTORY

On April 29, 2014, an information was filed, alleging that appellant had committed two offenses against Joshua Martinez. The information charged appellant in count 1 with assault by means likely to produce great bodily injury (count 1; Pen. Code, § 245, subd. (a)(4)), and in count 2 with involuntary manslaughter (count 2; Pen. Code, § 192, subd. (b).) [1] Accompanying count 1 were allegations that appellant personally inflicted great bodily injury on Martinez, thereby causing him to become comatose (§ 12022.7, subds. (a), (b).) [2] Appellant pleaded not guilty and denied the special allegations.

A jury found appellant guilty as charged, and found the special allegations to be true. The trial court sentenced appellant to a total term of seven years.

---

[1] All further statutory citations are to the Penal Code, unless otherwise indicated.

[2] The information also charged the offense alleged under count 1 against Timothy Coley, Jonas Ramos, Angel Moroyoqui, and Jonathan Aquino. None of those co-defendants was tried with appellant. Coley pleaded no contest to the charge and testified as a prosecution witness at appellant's trial.

## FACTS

A. *Prosecution Evidence*

On August 5, 2013, appellant attended the Ixtapa club in Pasadena with Timothy Coley and Coley's sister Ashley.[3] Accompanying them were Jonas Ramos, Angel Moroyoqui, and Jonathan Aquino. Also present in the club was a group of members of the United States Marine Corps, including Joshua Martinez, Andrew Olson, and Christopher Chung. The marines were not on duty. In the company of the marines were Mary Rivera and two other females.

Coley testified that at some point, Ashley returned from the club's restroom, crying. Ashley said that while she was using the restroom, a man walked in on her. The man's conduct angered Coley. Later, appellant remarked to Coley, "Hey, some guy just walked into the bathroom on your sister." According to Coley, appellant was mad. Coley and appellant went to the club's patio, where Coley saw that Ramos, Moroyoqui, and Aquino were also upset.

Mary Rivera testified that inside the club, four or five people approached Martinez and her in an unfriendly manner. She grabbed Martinez's hand and led him away. Soon afterward, the club's security personnel asked Martinez's group and the other group to leave the club.

Michael Hernandez, a bouncer at the Ixtapa, testified that he saw five men surround one of the marines near the dance floor. The group directed angry remarks toward the marine, who remained calm. Shortly afterward, a female pulled the marine away. To defuse the situation, Hernandez asked the marine's group to leave the club. The marine and his friends were compliant, and agreed to

---

[3] Because Timothy Coley and his sister share their surname, we refer to her as "Ashley."

3

do so.  As they left the club, the other group watched them with "pretty aggressive looking expressions."  Although Hernandez did not identify appellant as among the five men who surrounded the marine, he saw appellant in the club that evening, and believed that appellant was a member of an angry and aggressive-looking group that gathered in the club's patio after the incident involving the marine.

Coley testified that his group gathered in the Ixtapa's patio, where appellant said, "'Let's go get him,'" or "'Let's go get those guys.'"  Coley, Ramos, Moroyoqui, and Aquino then followed appellant out of the club and onto the street.  They saw Martinez, Olson, and Chung standing by a light post close to Barney's Beanery, a restaurant near the Ixtapa.

The events that followed were recorded by two video cameras.  One was in a taxi parked in front of the Ixtapa, and the other was on the roof of Barney's Beanery.  The prosecution called several witnesses regarding the events outside the Ixtapa, as shown in the video recordings from the cameras.

According to Coley, when appellant's group moved toward the three marines, Martinez was facing the street, with his back to Barney's Beanery.  As appellant and his friends neared Martinez, Coley passed Olson.  Appellant approached Martinez from behind and punched him one time.  Martinez fell to the ground.  After appellant struck Martinez, fighting broke out.  Nearby, Olson stabbed Ramos and Moroyoqui.  Although Coley testified that during the fight he did not see Olson draw or use a knife, he also stated that the taxi video recording showed that the stabbings occurred after appellant punched Martinez.

Chung testified that after his group left Ixtapa, some of his friends entered Barney's Beanery, while he, Martinez, and Olson remained outside, along with two females.  According to Chung, he was "on alert" because Olson pointed out

4

some people were following them, but Chung did not know whether they posed a threat.  Chung did not see the approach of Martinez's assailant, who came up to Martinez from behind and punched him.  After Martinez fell to the ground, Chung moved toward the assailant, who threw a punch at him.  Chung then fought with the assailant and his group in order to defend himself and Martinez.

Olson testified that while in front of Barney's Beanery, he noticed some individuals approaching with their eyes on Martinez.  Moments later, he heard a loud hit, and saw several persons attack Martinez, including appellant, Ramos, Moroyoqui, Aquino, and Coley.[4]  Martinez's head struck the ground with great force, and blood came from his mouth.  In order to distract the assailants from Martinez, Olson drew a knife and stabbed the closest person attacking Martinez.  He later stabbed another person.  The altercation ended when the assailants saw Olson's knife and warned one another, "'He has a blade.  He has a blade.  Don't fight him.'"  Olson and his friends then chased the assailants away.  Shortly afterward, Olson threw the knife away and changed his clothes.  When questioned by police officers, Olson said that he had used a knife and described where it was.

Rivera testified that after leaving the Ixtapa, she and a friend were walking ahead of the marines when she heard a commotion behind her.  Although she did not see the fight begin, at some point she heard someone yell that a person had a blade or knife.

Martinez suffered a severe cranial injury that rendered him comatose.  He later died of that injury.

---

[4]    Because Olson was unavailable as a witness, excerpts from his preliminary hearing testimony were admitted at trial.

5

B. *Defense Evidence*

Ashley testified that on August 5, 2013, she went to the Ixtapa's bathroom, entered a stall, locked its door, and pulled down her pants. Martinez came into the bathroom with a woman, pushed the door to Ashley's stall open, and despite her repeated demands, did not close it. After Ashley closed the door herself, Martinez left the bathroom. Upon returning to the club's main area, she saw Martinez, who smirked at her. Ashley began to cry, and talked to Ramos and Coley. She told them, "'They walked into my stall,'" and "'Somebody opened my stall door.'" According to Ashley, she did not identify Martinez as that person to anyone in her group.

Called by the defense, Coley testified that when he saw Ashley, she told him that "[a] man had walked into the restroom on her." According to Coley, that was "all she said." Coley further testified that when his group approached Martinez, appellant was "first in line." Ramos was "second in line," and the closest person to Olson. According to Coley, the video recording from the taxi camera showed that at the approximate time appellant punched Martinez, Ramos threw a punch at someone.

Pasadena Police Detective Cuong Pham testified that after the incident outside Barney's Beanery, he interviewed Olson, who showed him the location of the knife Olson had used. Pham concluded that Olson had stabbed two people because they attacked him.

Appellant did not testify.


**DISCUSSION**

Appellant contends (1) that the trial court improperly excluded evidence, (2) that Coley's testimony as an accomplice was not sufficiently corroborated, (3)

6

that there is insufficient evidence to sustain his convictions, (4) that the jury was misinstructed, (5) that there was prosecutorial misconduct, and (6) that the jury engaged in misconduct. For the reasons discussed below, we reject his contentions.

A. *Limitation on Presentation of Evidence Relating to Bathroom Incident*

Appellant contends the trial court improperly "sanitized" evidence regarding Ashley's encounter with a man in the Ixtapa bathroom. Although the court admitted Ashley's remarks to Coley after that incident, it excluded some details of the incident. Appellant argues that the excluded evidence was relevant to his theory of self-defense because it showed that Martinez was the "instigator" of the fight. In addition, he argues that the evidence established that Coley and Ramos had powerful reasons to wish to punch Martinez. As explained below, we see no error in the trial court's rulings.

1. *Governing Principles*

Our focus is on whether the trial court properly admitted Ashley's remarks to Coley regarding the bathroom incident while limiting the admission of evidence concerning the details of that incident. Generally, remarks admitted as circumstantial evidence of the hearer's state of mind are not submitted for their truth, and thus fall outside the scope of the hearsay rule. (*People v. Bolden* (1996) 44 Cal.App.4th 707, 714-715; *People v. Roberson* (1959) 167 Cal.App.2d 429, 431; 1 Witkin, Cal. Evidence (5th ed. 2012) Hearsay, §§ 32, n, pp. 825-826, 835.) The trial court's determinations of relevance relating to the bathroom incident are reviewed for abuse of discretion. (See *Spolter v. Four Wheel Brake Serv. Co.* (1950) 99 Cal.App.2d 690, 699.)

7

### 2. *Underlying Proceedings*

Prior to trial, the prosecutor asked the court to limit the admission of evidence regarding Ashley's encounter with the man in the Ixtapa bathroom. The prosecutor argued that the incident itself had "no relevance," with the exception of Ashley's remarks to Coley after the incident, which were "not being offered for the truth[,] but only to explain their subsequent actions." Defense counsel contended that Ashley's remarks were inadmissible as hearsay. In the alternative, he requested leave to examine witnesses regarding the details of the bathroom incident.

The court concluded that Ashley's remarks were admissible because they were not offered "for the truth," but denied defense counsel's request to admit evidence relating to the incident's details, absent an adequate showing of relevance. The court further ruled that counsel would be permitted to renew his request if Ashley was called as a defense witness.

During the prosecution's case-in-chief, Coley testified that Ashley told him a man had walked into the bathroom. The court instructed the jury that the testimony was "not admitted to prove the truth of [Ashley's] statements[,] but . . . only for the limited purpose of explaining subsequent actions, if any, of [Coley]."

After the prosecution completed its case-in-chief, defense counsel sought to examine Ashley regarding the bathroom incident. According to counsel's offer of proof, Ashley would testify that after she entered a bathroom stall and pulled down her pants, a man followed another woman into the bathroom and asked her to have sex with him in a stall. When the woman refused, the man forced open the door of Ashley's stall and "gawk[ed] at her." Ashley stood, pulled up her pants, closed the

8

stall door, and demanded that the man leave the bathroom.  She then reported the incident to Coley and two other people.

In response, the prosecutor contended that the proposed testimony was irrelevant, as Ashley did not intend to testify that her statements to Coley contained more details regarding the bathroom incident than the statements already described by Coley.  The prosecutor argued that the proposed testimony was offered merely "to dirty up [the] victim."

The trial court concluded that although some details of the bathroom incident were relevant "to show the circumstances surrounding the crime," additional aspects of Ashley's proposed testimony were inadmissible.  The court excluded the man's remarks to the woman as hearsay, determined that Ashley's state of mind during the incident was irrelevant, and limited Ashley's testimony to certain events she saw.

### 3. *Analysis*

In our view, the court did not abuse its discretion in limiting Ashley's testimony.  In *People v. Davis* (1965) 62 Cal.2d 791, 793, the defendant was charged with the murder of his wife's friend.  At trial, he contended that the crime was committed in the heat of passion and while he lacked the mental capacity to engage in a premeditated murder.  (*Id*. at p. 795.)  In support of those theories, he sought to admit three notebooks containing passages purportedly showing that his wife and his victim were engaged in an affair.  (*Id*. at p. 798.)  Although the trial court admitted those passages, it excluded the remaining portions of the notebooks as irrelevant.  (*Ibid.*)  Our Supreme Court affirmed the ruling, concluding that the selected passages were properly admitted as circumstantial evidence of the

defendant's state of mind, and that the trial court did not abuse its discretion in refusing to admit the remainder of the notebooks. (*Ibid*.)

We reach a similar conclusion here. There is no evidence that the excluded details of the bathroom incident were ever communicated to Coley, appellant, or anyone else in appellant's group. For that reason, the excluded evidence was irrelevant to appellant's claim of self-defense and Coley's and Ramos's motivations in attacking Martinez. Accordingly, the court did not err in limiting the admission of evidence relating to the bathroom incident.[5]

B. *Corroboration of Coley's Accomplice Testimony*

Appellant contends there was insufficient corroboration of the testimony from Coley, who was the sole witness to identify appellant as the person who punched Martinez. A defendant may not be convicted "upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ." (§ 1111.) Because Coley was an accomplice to the attack on Martinez, appellant argues his convictions must be reversed. We disagree.

Generally, ""'[t]he requisite corroboration may be established entirely by circumstantial evidence. [Citations.] Such evidence 'may be slight and entitled to little consideration when standing alone. [Citations.]'"' [Citations.] "'Corroborating evidence 'must tend to implicate the defendant and therefore must relate to some act or fact which is an element of the crime but it is not necessary

---

[5] It is thus unnecessary for us to examine each reason for the evidentiary rulings, as we may affirm those rulings on any correct ground shown by the record. (*Philip Chang & Sons Associates v. La Casa Novato* (1986) 177 Cal.App.3d 159, 173.)

that the corroborative evidence be sufficient in itself to establish every element of the offense charged.' [Citation.]"' [Citations.] In this regard, 'the prosecution must produce independent evidence which, without aid or assistance from the testimony of the accomplice, tends to connect the defendant with the crime charged. [Citation.]' [Citation.] '"Corroborating evidence is sufficient if it substantiates enough of the accomplice's testimony to establish his credibility [citation omitted]."' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1128.)

Under these principles, the requisite evidence "'need not independently establish the identity of the victim's assailant' [citation], nor corroborate every fact to which the accomplice testifies [citation.]." (*People v. Romero* (2015) 62 Cal.4th 1, 32, quoting *People v. Abilez* (2007) 41 Cal.4th 472, 505 (*Abilez*).) In *Abilez*, the defendant and a co-defendant were charged with the murder of the defendant's mother. (*Abilez*, *supra*, 41 Cal.4th at pp. 481-482.) At trial, the co-defendant testified that he saw the defendant attack his mother, and that he then helped him loot her house. (*Id*. at p. 484.) Although the co-defendant was the sole witness to identify the defendant as the killer, other witnesses testified they heard the defendant state he wanted to kill his mother, and overheard an argument between the defendant and his mother on the date of her death. (*Id*. at pp. 505-506.) Other evidence also substantiated aspects of the co-defendant's description of the killing. (*Ibid*.) Our Supreme Court concluded there was "ample evidence" corroborating the co-defendant's identification testimony. (*Id*. at p. 506.)

We reach the same conclusion here, as there was considerable independent evidence that appellant was in Ashley's group in the Ixtapa and participated in the attack on Martinez. Ashley testified that appellant was with her in the Ixtapa. The club bouncer, Hernandez, testified that he believed appellant was in the angry and

11

aggressive-looking group that gathered in the club's patio after five men had surrounded the marine in the club. According to Olson, appellant was one of the individuals he saw attacking Martinez near Barney's Beanery. In addition, although Chung did not identify appellant at trial, shortly after the underlying incident, he viewed a photographic "six-pack" lineup and identified appellant as "look[ing] like" a member of the group that had conducted the assault. Taken as a whole, this evidence adequately corroborated Coley's identification testimony.

*People v. Falconer* (1988) 201 Cal.App.3d 1540, upon which appellant relies, is distinguishable. There, the defendant was charged with the robbery of marijuana plants from a farm. (*Falconer, supra,* 201 Cal.App.3d at p. 1542.) At trial, the prosecution's key witness was an accomplice to the robbery, who testified that the defendant had planned the robbery, which was carried out by several masked intruders, including the defendant. (*Id*. at p. 1542.) Reversing the defendant's conviction, the appellate court concluded there was insufficient corroboration of the accomplice's testimony, as the evidence independent of that testimony showed only that the defendant was the father of one of the intruders, that he had visited the farm several months prior to the robbery, and that he knew that marijuana was grown there. (*Id.* at p. 1543.) In contrast, here there was significant independent evidence that appellant, in fact, participated in the assault on Martinez. In sum, the record discloses sufficient corroboration of Coley's testimony.

C. *Sufficiency of the Evidence Regarding Appellant's Offenses*

Appellant challenges the sufficiency of the evidence to support his convictions, arguing there is no substantial evidence that he was the person who

12

punched Martinez.[6]  That contention fails, as Coley testified that he saw appellant punch Martinez.  Accordingly, the jury reasonably concluded that appellant was Martinez's assailant.

Appellant challenges the credibility of Coley's testimony, pointing to conflicts between that testimony and other evidence, the uncertainties attending eyewitness identifications, and the fact that Coley was called as a prosecution witness after he pleaded no contest to the assault charge relating to Martinez.[7]  Regarding the latter event, Coley testified at trial that he was charged as a defendant in the case, entered a plea of no contest, and was placed on probation.  According to Coley, probation was imposed due to his lack of a criminal record and minimal involvement in the crime.  Coley further testified that he provided a "factual basis plea," that is, described the circumstances of the crime in response to questioning by the prosecutor.  At trial, the prosecutor relied on the transcript of

---

[6]  "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]  On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends.  [Citation.]  Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]'  [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

[7]  In addition, appellant also asserts that the jury engaged in misconduct relating to its determination that appellant punched Martinez.  We consider and reject that contention separately below (see pt. D.2. of the Discussion, *post*).

the factual basis plea to refresh Coley's memory regarding aspects of the attack on Martinez.

Appellant's challenge to Coley's credibility "misapprehends our role as an appellate court. Review for substantial evidence is not trial de novo. [Citation.]" (*OCM Principal Opportunities Fund, L.P. v. CIBC World Markets Corp.* (2007) 157 Cal.App.4th 835, 866.) On such review, "[c]onflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of . . . [the factfinder] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." (*People v. Huston* (1943) 21 Cal.2d 690, 693, disapproved on another ground in *People v. Burton* (1961) 55 Cal.2d 328, 352.) A witness's statements in testimony may be rejected only when "there must exist either a physical impossibility that they are true, or their falsity . . . [is] apparent without resorting to inferences or deductions." (*People v. Huston*, *supra,* 21 Cal.2d at p. 693.) That is not the case regarding Coley's testimony.

In a related contention, appellant asserts that "Coley's plea deal required him . . . [to] testify that appellant . . . started the fight by punching Martinez and knocking him to the ground" and "barred Coley from testifying for appellant." The record provides no support for those assertions. Coley testified that when he entered his plea, no one told him he was required to "come to court and testify against [appellant]." Coley further stated that at the time of his plea, the prosecutor said she wanted him "to recite certain facts" so that he could not later "testify for [appellant]." Interpreted in context, that testimony implies only that the prosecutor examined Coley regarding the factual basis of the crime in order to deter him from providing a different account at trial more favorable to appellant.

14

In sum, the record discloses substantial evidence that appellant was the person who punched Martinez.

D. *Instructions Regarding Self-Defense*

Appellant contends the trial court erred in rejecting his requests for jury instructions relating to the defense of self-defense. However, "[t]he trial court need not give such instructions on request absent substantial evidence to support them." (*People v. Stitely* (2005) 35 Cal.4th 514, 551 (*Stitely*); *People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).) As explained below, that is the case here.[8]

1. *Perfect Self-Defense Instruction*

The trial court declined to instruct the jury with CALCRIM No. 3470, which sets forth the "perfect" defense of self-defense. That defense, if established, exonerates a defendant of the crimes of manslaughter (*People v. Randle* (2005) 35 Cal.4th 987, 991, overruled on another ground in *People v. Chun* (2009) 45 Cal.4th 1172, 1200) and assault with force likely to produce great bodily injury (*People v. Goins* (1991) 228 Cal.App.3d 511, 517). The defense "does not depend upon the existence of actual danger, but rather depends upon appearances." (*People v. Clark* (1982) 130 Cal.App.3d 371, 377, abrogated on another ground in *People v. Blakeley* (2000) 23 Cal.4th 82, 92.) To establish the defense, the defendant need only show that he had "an honest and reasonable belief in the need to defend himself . . . ." (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1168.)

---

[8] On appeal, we employ a de novo standard of review, and thus independently determine whether the instruction should have been given. (*Manriquez*, *supra*, 37 Cal.4th at pp. 581, 584.)

Nonetheless, under the doctrine, the defendant's fear "'"'must be of *imminent* danger to life or great bodily injury.'"'" (*Stitely*, *supra*, 35 Cal.4th at p. 551, quoting *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

The defense is subject to two principles pertinent here. When the victim belongs to a potentially hostile group, the defendant must show that threatening conduct by group members other than the victim is "reasonably associated [with] the victim . . . ." (*People v. Minifie* (1996) 13 Cal.4th 1055, 1068.) Furthermore, perfect self-defense may not be invoked by a defendant "who, through his own wrongful conduct (e.g., the initiation of a physical assault or the commission of a felony), has created circumstances under which his adversary's attack or pursuit is legally justified." (*In re Christian S.* (1994) 7 Cal.4th 768, 773, fn. 1.)

In rejecting appellant's request for the self-defense instruction, the trial court found no evidence that appellant attacked Martinez because he actually believed Martinez posed an imminent danger to him, and no evidence that appellant had a reasonable basis for any such belief. We agree.

The record is devoid of evidence that inside the Ixtapa, Martinez's group engaged in threats or other conduct sufficient to create in appellant the actual and reasonable belief that Martinez posed an imminent danger to him. Coley identified no such conduct by Martinez's group. Hernandez testified that the marine surrounded by the angry men remained calm, and that the marine's group was compliant when Hernandez asked them to leave the club. Olson testified that he did not see that incident. According to Olson, inside the club, Martinez told him that "some guys [had] tried jumping him," and that the club's security personnel had asked Martinez's group to leave the club. Olson further stated that Martinez urged him to "relax" because "nothing else was going to happen . . . ."

16

Chung testified that he was not present when appellant's group confronted Martinez inside the club.

Nor is there evidence that outside the club, Martinez's group engaged in any threatening conduct. Although the video recordings show that shortly before the attack, Martinez and his friends turned to face the general direction of appellant's approaching group, nothing suggests Martinez's group provoked the attack. Coley testified that appellant punched Martinez from behind. Although Olson and Chung noticed individuals following them, neither immediately regarded them as engaged in an attack. Olson testified he first focused on Martinez's assailants a second before Martinez was punched, and Chung testified he saw an assailant only when the punch occurred.

Appellant contends Olson's use of a knife supported a self-defense instruction. However, there is no evidence that appellant punched Martinez because he actually and reasonably believed that Martinez -- rather than Olson -- had a knife. The only percipient testimony regarding Olson's use of a knife came from Olson himself, who stated that when a punch felled Martinez, he drew a knife and used it to defend Martinez. Olson's testimony regarding the timing of his knife use was not challenged by Coley or Chung, who stated they did not see Olson holding a knife during the fight.[9] Accordingly, Olson's testimony does not

_____

[9]     Appellant maintains that Coley's testimony constituted substantial evidence that Olson drew his knife before appellant punched Martinez, pointing to the following portion of Coley's cross-examination:

"Q. And you know now that Mr. Olson had a knife; correct?

"A. Yes. But I never s[aw] the knife. I didn't know anybody got stabbed during this whole incident . . . until we got back to the Ixtapa restaurant . . . .

*(Fn. continued on next page.)*

17

support a reasonable inference that appellant regarded Martinez as threatening imminent harm to him by means of a knife before he punched Martinez.

Nor does the remaining evidence support such an inference. The video recordings -- which were concededly grainy -- appeared to show Olson making a stabbing motion toward Ramos immediately after Martinez was punched, but did not clearly show when Olson first displayed his knife or whether appellant ever saw it. Although Rivera -- who did not see how the altercation began -- testified she heard a person yelling that someone had a knife or blade, she could not say when that event occurred. The only witness to do so was Olson, who testified that the fighting *ended* when the assailants saw that he had a knife, warned one another, and fled. There is thus no evidence that before punching Martinez, appellant reasonably believed that Martinez intended to use a knife against him. In sum, the trial court properly declined to instruct the jury regarding perfect self-defense.

---

"Q. You are confident that the fight started with a punch and not with someone pulling a knife out?

"A. I can't say confident. I wasn't paying attention to Olson to know who threw the punch first. I don't know if the knife was out before [appellant] threw the punch, and I don't know if he hit him before the knife was pulled out." On this record, appellant's contention fails, as Coley's lack of knowledge whether Olson drew his knife before appellant punched Martinez does not constitute substantial evidence regarding the timing of those events. (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 ["Speculation or conjecture alone is not substantial evidence."].)

18

## 2. *Mutual Combat Instruction*

The trial court also denied appellant's request to instruct the jury with CALCRIM No. 3471, which states that a defendant engaged in mutual combat with another person by agreement has the right to self-defense after making specified "good faith" efforts to end the combat.[10] For the reasons discussed above, there is no evidence to support that instruction, as nothing suggests that appellant and Martinez had been engaged in mutual combat by agreement or that appellant made "good faith" efforts to foreclose combat with Martinez before punching him.

### E. *Prosecutorial Misconduct*

Appellant contends the prosecutor engaged in three instances of misconduct during the rebuttal portion of her closing argument. As explained below, we discern no misconduct supporting a reversal of the judgments.

---

[10]     CALCRIM No. 3471 states in pertinent part: "A person who (engages in mutual combat/ [or who] starts a fight) has a right to self-defense only if: [¶] 1. (He/She) actually and in good faith tried to stop fighting; [¶] [AND] [¶] 2. (He/She) indicated, by word or by conduct, to (his/her) opponent, in a way that a reasonable person would understand, that (he/she) wanted to stop fighting and that (he/she) had stopped fighting(;/.) [¶] . . . [AND [¶] 3. (He/She) gave (his/her) opponent a chance to stop fighting.] [¶] If the defendant meets these requirements, (he/she) then had a right to self-defense if the opponent continued to fight. [¶] . . . [¶] [A fight is *mutual combat* when it began or continued by mutual consent or agreement. That agreement may be expressly stated or implied and must occur before the claim to self-defense arose.]"

19

1. *Governing Principles*

Generally, ""'[a] prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"" [Citation.] "'Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ""'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"""" [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 260.) Prosecutorial misconduct is examined for prejudice under the test in *People v. Watson* (1956) 46 Cal.2d 818, 836, unless it requires assessment under the test for federal constitutional error in *Chapman v. California* (1967) 386 U.S. 18, 24. (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1077 (*Herring*).) Absent an objection and request for an admonition to the jury, we review a contention of prosecutorial solely when "'an admonition would not have cured the harm caused by the misconduct.'" (*People v. Earp* (1999) 20 Cal.4th 826, 858.)

2. *Vouching*

Appellant contends the prosecutor engaged in improper vouching in discussing Coley's testimony. As explained below, appellant has shown no misconduct.

"Although a prosecutor may state his opinion formed from deductions made from evidence introduced at the trial, he or she may not express a personal opinion as to guilt if there is substantial danger that a juror will interpret it as being based on information not in evidence. Further, the prosecutor is prohibited from stating or implying facts for which there is no evidence before the jury. [Citations.]" (*People v. Heishman* (1988) 45 Cal.3d 147, 195, abrogated on another ground in

20

*People v. Diaz* (2015) 60 Cal.4th 1176, 1190, 1195.)  In view of these principles, "[i]mpermissible 'vouching' may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.  [Citations.]" (*People v. Fierro* (1991) 1 Cal.4th 173, 211, disapproved on different grounds in *People v. Letner & Tobin* (2010) 50 Cal.4th 99, 205-206 and *People v. Thomas* (2012) 54 Cal.4th 908, 941.)

### a.  *Underlying Proceedings*

The jury was instructed with CALCRIM No. 523, which sets forth factors relevant to the evaluation of witness credibility, including the witness's ability to see, remember, and describe the pertinent events, the witness's behavior while testifying, and the consistency of that testimony with the witness's prior statements and the other trial evidence.  During the rebuttal portion of closing argument, in discussing Coley's testimony, the prosecutor directed the jury's attention to those factors.

After asserting that Coley had been well positioned to view the attack on Martinez, the prosecutor argued:  "How well was [Coley] able to remember and describe what happened? . . .  [H]e told the police what happened.  He pled guilty to assault . . . .  And when he did, I required from him a factual basis plea."  Defense counsel then asserted an objection on the ground that the argument "misstate[d] testimony," which the trial court overruled.

Uninterrupted by further objections from defense counsel, the prosecutor argued:  "Coley took the stand, and we talked about how we took a factual basis plea because we don't want codefendants in trials . . . to come back and testify on behalf of the defendant.  We don't want them to come back and lie and say, hey, it

21

was really me or it was really Johnny? [¶] We want to lock them into their statement to the police. We want to lock them into the truth. . . . [¶] . . . [Coley] told this to the police. He said this during his factual basis plea which was also under oath, and he came into court, and . . . testified to what happened twice. And every time he said what happened, it was consistent."

The prosecutor further argued: "What was the witness'[s] behavior while testifying? Well, . . . Coley was not thrilled to be here, obviously. . . . [H]e had to testify against a family friend and friend of his. And while he was not excited to be here, he answered every question truthfully and to the best of his ability, squirming sometimes as he had to, but he answered everything truthfully. [¶] . . . Did [Coley] make a statement in the past that was consistent or inconsistent with his testimony? [¶] Everything that he said so far has been consistent. [¶] How reliable is the testimony when you consider all the other evidence in this case? And everything . . . Coley has testified to comports with all the other evidence . . . ."

### b. *Analysis*

Appellant contends the prosecutor's remarks regarding Coley's factual basis plea "implied the district attorney's office would not have entered a plea deal unless Coley told the truth." Relying on that purported implication, he argues that the prosecutor improperly tried to enhance Coley's credibility by reference to facts outside the trial evidence and the prestige of the district attorney's office.

We conclude that appellant has forfeited his contention, as defense counsel asserted no objection to the pertinent remarks, which cannot be regarded as incurably prejudicial. Appellant objected only to the prosecutor's initial reference to Coley's factual basis plea on the ground that the reference misstated Coley's

testimony. As Coley had described his factual basis plea in detail, that objection was properly overruled. Appellant otherwise raised no objection to the prosecutor's ensuing remarks regarding Coley's plea, which are the focus of appellant's contention.

Furthermore, a timely admonition would have nullified any suggestion conveyed by those remarks that there might be an extrinsic basis for accepting Coley's account of the crime. Viewed in context, the prosecutor's remarks were aimed at showing the consistency of Coley's descriptions of the crime from his first police interview to his trial testimony, and not at enhancing Coley's credibility by reference to improper considerations. Coley did not testify that his plea was predicated on any agreement with the district attorney's office. On the contrary, as noted above (see pt. C. of the Discussion, *ante*), Coley expressly stated that no one had required him to testify against appellant. Rather, the prosecutor's remarks alluded to a specific portion of Coley's testimony, where he explained that at the time of his plea, the prosecutor told him she wanted him "to recite certain facts" so he could not later "testify for [appellant]." As discussed above (see pt. C. of the Discussion, *ante*), that testimony was intended to show that the prosecutor had examined Coley regarding the factual basis of the crime in order to deter him from providing a different account at trial more favorable to appellant. The prosecutor's remarks during her closing argument thus focused on the consistency of Coley's statements regarding the crime, notwithstanding her characterizations of his statements to the police, factual basis plea, and trial testimony as truthful. For that reason, any suggestion of vouching was curable by a timely admonition. Accordingly, appellant has established no prosecutorial misconduct.

23

### 3. *References to Defense Counsel's Opening Statement*

Appellant contends the prosecutor, in referring to defense counsel's opening statement, improperly argued that defense counsel knew that he was guilty. For the reasons discussed below, he has established no misconduct.

Generally, ""'"a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom."'"" (*People v. Wharton* (1991) 53 Cal.3d 522, 567, quoting *People v. Sassounian* (1986) 182 Cal.App.3d 361, 396.) Under that principle, "[i]t is no[t] misconduct to pointedly highlight . . . the contradictions in a defendant's case." (*People v. Welch* (1999) 20 Cal.4th 701, 752-753 (Welch), overruled on another ground in *People v. Blakeley, supra,* 23 Cal.4th at pp. 90-91.) Thus, the prosecutor may comment on discrepancies between defense counsel's opening statement and the defense case presented at trial. (*People v. Chatman* (2006) 38 Cal.4th 344, 385.) Nonetheless, the prosecutor may not argue that defense counsel does not believe in his client's defense, as such an argument directs the jury's attention to an irrelevant factor. (*People v. Thompson* (1988) 45 Cal.3d 86, 112 (*Thompson*).)

Instructive applications of these principles are found in *Thompson* and *Welch*. In *Thompson*, the defendant was charged with the murder and rape of a 20-year old woman. (*Thompson*, *supra*, 45 Cal.3d at p. 96.) At trial, the defendant testified that he was asleep when the crimes occurred, and identified another person as the probable perpetrator. (*Id*. at pp. 99-100.) During the open portion of the closing argument, the prosecutor stated that defense counsel would probably disregard the defendant's testimony. (*Id*. at p. 112.) On appeal, the defendant contended the prosecutor's argument constituted misconduct because it implied that defense counsel disbelieved his own client. (*Ibid*.) Rejecting that

24

contention, the court concluded that the focus of the prosecutor's argument was on the evidence, not on defense counsel's beliefs. (*Id*. at pp. 112-113.)

In *Welch*, the defendant was charged with murder. (*Welch*, *supra*, 20 Cal.4th at p. 721.) At trial, the defendant testified that he did not commit the crime, but his counsel also presented evidence that the defendant was not mentally capable of premeditated killing when the crime occurred. (*Id*. at p. 725.) During closing arguments, the prosecutor commented on the contradiction in the defense case, asserting that "'[t]hey want[ed] it both ways.'" (*Id*. at p. 752.) Our Supreme Court held that the prosecutor's argument was not misconduct. (*Id*. at p. 753.)

### a. *Underlying Proceedings*

During the opening statements, defense counsel asserted that the video recordings would show that Olson drew his knife before Martinez was punched. Counsel stated: "[A]fter you have viewed and paid attention to all of the evidence in this case, you will find that [appellant] is not guilty of these charges because any punch that he threw was in reaction to . . . Olson brandishing this knife and threatening[] not only . . . [appellant,] but also the other people in his group." Counsel further maintained that the jury would find appellant "acted in self-defense and . . . also acted in the defense of his buddies . . . ."

Following the close of the presentation of evidence, the trial court denied appellant's request for instructions relating to self-defense on the ground that there was no evidence to support them (see pt. D.1. of the Discussion, *ante*). During defense counsel's closing argument, upon an objection by the prosecution, the trial court ruled that defense counsel could not offer a theory of self-defense to the jury. Following that ruling, defense counsel argued to the jury, inter alia, that there was

25

evidence that more than one person threw a punch at Martinez, and that Coley's identification of appellant as the puncher was insufficiently corroborated.

During the rebuttal portion of closing argument, the prosecutor asked, "How do we know [appellant] is the puncher?" After noting that the opening statements were not evidence, the prosecutor provided what she termed a "paraphras[e]" of defense counsel's opening statement, asserting that he had effectively stated, "You're going to find [appellant] acted in self-defense and in defense of others." Defense counsel then raised an objection on the ground that the argument "misstate[d]" the opening statement, which the trial court overruled.

When the prosecutor resumed her argument, the following dialogue occurred:

"Ms. Kee [the prosecutor]: Not once does he mention in his opening statement that [appellant] is not the puncher. That is because he knows [appellant is] the puncher. [Appellant] is the puncher. Throughout the entire course of this trial, [counsel] is asking questions . . . that presuppose[] he's the puncher. . . .

"Mr. Smalls [defense counsel]: Objection. Relevance of my opening statement. It's not evidence.

"The court: Sustained as phrased.

"Ms. Kee: So the defense -- the defendant knows that he is the puncher. [Defense counsel] stopped and started and stopped and started the video. . . . Why? Because he was trying to establish self-defense. He never even --

"Mr. Smalls: Objection, your honor.

"The court: Sustained.

"Ms. Kee: He was trying to establish self-defense.

"Mr. Smalls: Objection, your honor."

26

After sustaining that objection, the court conducted a sidebar conference, during which defense counsel sought a mistrial on the ground that the prosecutor had commented on defense counsel's failure to offer the theory of self-defense set forth in his opening statement. He argued that the prosecutor's remarks violated the court's ruling barring him from asserting that theory during his closing argument, and thus constituted prosecutorial misconduct. In denying that motion, the trial court remarked that the prosecutor was entitled to comment on defense counsel's opening statement, but told the prosecutor that the opening statement did not "deserve[] any more time."

Following the sidebar conference, the prosecutor argued to the jury: "So what you're left to decide this case with is the evidence. You have the evidence of . . . Coley and all the other witnesses that corroborate . . . Coley. What you don't have is any evidence that [appellant] is not the puncher."

b. *Analysis*

Appellant contends the prosecutor's remark that defense counsel knew that appellant was the puncher constitutes reversible prosecutorial misconduct. He argues that the remark implied that defense counsel knew that appellant was guilty, accused defense counsel of suborning perjury, and denigrated the presumption of innocence, as well as the requirement that criminal guilt be proven beyond a reasonable doubt. However, as the record discloses no request for an admonition in connection with the objections to the prosecutor's remarks, appellant has forfeited his contention.

As our Supreme Court has explained, "to preserve the issue of prosecutorial misconduct on appeal, the defendant must both object *and* request a curative admonition unless such admonition would have failed to cure to any prejudice."

27

(*People v. Lopez* (2013) 56 Cal.4th 1028, 1073.)  Thus, "failure to request a curative admonition . . . forfeits the claim," unless no such admonition is available. (*Lopez, supra,* 56 Cal.4th at p. 1073.)  Ordinarily, remarks by the prosecutor that cast defense counsel in a negative light are susceptible to curative admonitions (*ibid*.), as are remarks suggesting that defense counsel disbelieves an aspect of the defense case (*Thompson*, *supra,* 45 Cal.3d at p. 114).  Here, the prosecutor's remark that defense counsel knew that appellant was the puncher was incidental to the focus of her argument, namely, that defense counsel initially proposed a defense founded on the assumption that appellant was "the puncher."  Because the prosecutor emphasized to the jury that the opening statement was not evidence and that the jury was required to determine the puncher's identity on the basis of the evidence, her remarks cannot be regarded as beyond a curative admonition.

For similar reasons, we would reject the contention were we to address it. To show prosecutorial misconduct based on remarks to the jury, a defendant must demonstrate a reasonable likelihood the jury understood or applied those remarks in an improper or erroneous manner.  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1337.)  Viewed in context, the prosecutor's remark regarding defense counsel's knowledge of the puncher's identity was intended to underscore counsel's shift from a self-defense theory -- which implicated appellant as "the puncher" -- to a challenge to the prosecution's showing regarding the identity of Martinez's assailant.  That shift was properly subject to comment by the prosecutor.  Because the prosecutor repeatedly argued that the assailant's identity must be resolved on the basis of the evidence, there is no reasonable likelihood that her remarks misled the jury.

*Herring*, *supra*, 20 Cal.App.4th 1066, upon which appellant relies, is distinguishable.  There, the defendant was charged with sexual assault and related

28

crimes against a single victim. (*Id.* at p. 1070.) During the closing arguments, the prosecutor repeatedly disparaged defense counsel, stating at one point: "'His people are rapists, murderers, robbers, child molesters. He has to tell them what to say. He has to help them plan a defense. He does not want you to hear the truth.'" (*Id.* at pp. 1073, 1075.) The appellate court concluded that the remarks constituted misconduct not curable by admonition, as they implied that defense counsel's clients "were necessarily guilty of heinous crimes," and otherwise denigrated the presumption of innocence and the requirement that guilt be proved beyond a reasonable doubt. (*Id.* at p. 1075.) Here, the prosecutor's remarks had no such implications. In sum, appellant has shown no misconduct.


### 4. *Remark Regarding Failure to Take Responsibility*

Appellant contends the prosecutor, in asserting that appellant had failed to take responsibility for his conduct, improperly commented on his failure to testify. "In *Griffin v. California* (1965) 380 U.S. 609 [citation], the United States Supreme Court held that the prosecution may not comment upon a defendant's failure to testify in his or her own behalf. Its holding does not, however, extend to bar prosecution comments based upon the state of the evidence or upon the failure of the defense to introduce material evidence or to call anticipated witnesses. [Citations.] Nonetheless, . . . a prosecutor may commit *Griffin* error if he or she argues to the jury that certain testimony or evidence is uncontradicted, if such contradiction or denial could be provided only by the defendant, who therefore would be required to take the witness stand. [Citations.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1339, italics omitted.) As explained below, the record discloses no such error.

### a. *Underlying Proceedings*

Prior to the closing arguments, the trial court instructed the jury with CALCRIM No. 355, which directs the jury "not [to] consider, for any reason at all, the fact that [appellant] did not testify."

Later, near the end of the rebuttal portion of the closing argument, the prosecutor stated: "[A]ll the other players in this tragedy have taken responsibility for their actions. The only person that hasn't taken responsibility for his actions is [appellant]. [Appellant] punched . . . Martinez -- " When defense counsel raised an objection to that remark, the trial court sustained it, but denied counsel's request for a sidebar conference. The court then inquired whether the prosecutor's remark referred solely to Coley. The prosecutor agreed.

After the court again denied a request from defense counsel for a sidebar conference, counsel stated in open court, "I think my client's right to remain silent has been violated . . . [¶] . . . [¶] [The prosecutor] cannot comment on that." The court directed defense to "have a seat," and instructed the jury: "As to taking responsibility, that reference is to . . . Coley *only*. It's not *in any way* a comment on [appellant]." (Italics added.) Defense counsel then asserted: "I heard her say as to [appellant]."

When the prosecutor resumed her argument, she stated: "The presumption of innocence is what everyone is entitled to. . . . When that person is brought to trial, he's to be presumed innocent until I have proven him guilty. [¶] So [appellant] gets that presumption and . . . gets his trial." Immediately following that argument, the trial court instructed the jury: "[A] defendant in a criminal case has an absolute right to go to trial and deny the charges against him."

30

b. *Analysis*

Appellant maintains that the prosecutor's remark regarding his failure to take responsibility was a "thinly veiled" comment on his decision not to testify. We disagree.[11] Because the prosecutor asserted that appellant had not taken responsibility *for punching Martinez*, it is not reasonably likely that the jury regarded testifying as the prosecutor's intended method of taking responsibility, as few defendants plead not guilty and then admit the charged misconduct in testimony at their trial. Furthermore, the trial court instructed the jury not to take the remarks as a comment on appellant "in any way." That instruction directed the jury to draw no inferences regarding appellant from the prosecutor's remark. On this record, there is no reasonable likelihood that the jury understood the remark as an invitation to infer that appellant was guilty from his failure to testify. (*People v. Medina* (1995) 11 Cal.4th 694, 756.)

In a related contention, appellant asserts that the prosecutor's remark implied that he "had a duty to plead guilty," that is, amounted to a comment on appellant's exercise of his right to a trial. Insofar as the remark conveyed such a comment, the court's prompt admonition, coupled with the prosecutor's and court's affirmations of appellant's right to a trial, nullified any potential for prejudice. (*U.S. v. Smith* (11th Cir. 1991) 934 F.2d 270, 275 [prosecutor's remark in closing argument that defendant, by pleading not guilty, had failed to take responsibility was improper, but was rendered harmless by trial court's curative admonition].) In sum, appellant has shown no prejudicial prosecutorial misconduct.

---

[11] Because the trial court curtailed defense counsel's statement of his objection, we decline to find that he forfeited the contention by failing to request an admonition.

31

F.    *Juror Misconduct*

Appellant maintains that the judgment must be reversed due to juror misconduct.  As explained below, he has established no such misconduct.

1.    *Governing Principles*

Generally, a defendant forfeits a contention of juror misconduct absent a timely objection by means of a mistrial motion or other suitable motion.  (*People v. Wisely* (1990) 224 Cal.App.3d 939, 947-948.)  A mistrial should be granted only when the trial court "is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.'  [Citations.]"  (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

Although juror misconduct raises a presumption of prejudice, the presumption "is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice . . . . " (*In re Hamilton* (1999) 20 Cal.4th 273, 296.)  We independently assess whether such a reasonable probability of prejudice exists, but accept the trial court's findings of fact and credibility determinations if supported by substantial evidence.  (*People v. Harris* (2008) 43 Cal.4th 1269, 1303.)

2.    *Sleepy Juror*

Appellant contends the trial court erred in failing to dismiss a juror who fell asleep.  During the presentation of the prosecution's case-in-chief, the court directed the parties' attention to Juror No. 10, who appeared at times to have

difficulty staying awake. When questioned by the court, Juror No. 10 stated that she had fallen asleep for a "couple of minutes" during Coley's direct examination. Juror No. 10 further stated that she had heard all the other testimony, and was paying attention to the trial. Following the court's inquiries, defense counsel stated that Juror No. 10 "should be kept on the panel." Because the prosecutor and defense counsel affirmatively declined to request that Juror No. 10 be excused, the court decided to permit her to remain on the jury, provided that she was fully attentive.

Because defense counsel asserted no objection to Juror No. 10's continued service, appellant has forfeited his contention. (*People v. Foster* (2010) 50 Cal.4th 1301, 1341.) Furthermore, we would find that the court's decision was not prejudicial were there no forfeiture. Following Coley's direct examination, he was subject to cross- and re-cross-examination by defense counsel, and the video recordings shown during his direct examination were repeatedly displayed later in the trial. In addition, during the jury's deliberations, Coley's entire testimony was read back to the jury. The juror misconduct was thus harmless, even if assessed under the stringent test of prejudice applicable to federal constitutional error.

### 3. *Inquiry Regarding Appellant's Gait*

Appellant contends the jury improperly considered evidence not admitted at trial -- namely, appellant's gait, which the jurors saw in the courthouse hallway -- in determining that appellant was Martinez's assailant. He argues that the court's instructions were insufficient to prevent that purported misconduct.

Prior to the presentation of evidence of the jury, the trial court instructed the jury, "You must not allow anything that happens outside of the courtroom to affect your decision unless I tell you otherwise." In addition, the court stated, "Evidence

33

is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you to consider as evidence." Following the close of the presentation of evidence, the trial court provided a similar instruction, stating "'Evidence' is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I told you to consider as evidence. . . . [¶] . . . [¶] You must disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses."

During the jury's deliberations, the jury asked whether in determining appellant's identity in the video recordings it could consider his walking gait, which jurors had observed in the courthouse hallway. During the court's conference on the request, defense counsel argued that the correct answer was "No." The court informed the jury, "No. You must disregard anything you saw or heard when the court was not in session, even if it was done or said by one of the parties or witnesses."

Appellant has forfeited his contention, as defense counsel raised no objection to the trial court's answer to the jury's inquiry. Moreover, we would reject the contention were we to address it, as the record discloses no inadequacy in that answer or potential for prejudice to appellant. Because the court had repeatedly stated that it was entitled to identify items of information as evidence, it is unsurprising that the jury requested a determination regarding appellant's gait. Indeed, the fact that the jury expressly sought guidance manifested its intent to abide by the court's instructions and decision regarding its inquiry. Accordingly, appellant has shown no prejudicial juror misconduct.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

COLLINS, J.